SKC

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

|   |   |
|---|---|
| Jon Hyde and Michelle Hyde,<br><br>Plaintiffs,<br><br>v.<br><br>Willcox, City of, et al.,<br><br>Defendants. | No.  CV 20-00100-TUC-JGZ<br><br>**ORDER** |

Plaintiffs Jon and Michelle Hyde, parents of Luke Ian Hyde ("Luke"), who died in the custody of the Cochise County Sheriff's Office (CCSO) Willcox Detention Facility, brought this civil rights action through counsel, both in their individual capacities and as next friends and statutory beneficiaries of Luke, pursuant to 42 U.S.C. § 1983.  (Doc. 1.) Defendants have filed "The City and County Defendants Motion to Dismiss Plaintiffs' Complaint" (Doc. 9) pursuant to Federal Rule of Civil Procedure 12(b)(6).  The Motion has been fully briefed.  (Doc. 10, 11.)

The Court will deny the Motion to Dismiss and require Defendants to answer the Complaint.

**I.      Background**

In their Complaint, Plaintiffs sue the City of Willcox ("Willcox"); Cochise County; Cochise County employees Raymond Robinson, Detention Sergeant Brian Pralgo, Detention Officer Sam Bohlender, Lieutenant Sergeant Sean Gijanto, and D. Noland; Cochise County Fire Medic Jordan Faulkner; Willcox Police Officer Marsha Callahan-

1  English; Cochise County Detective J. Valle (a.k.a. J. Villa); Cochise County Sheriff Mark
2  Dannels; and Willcox Director of Public Safety Dale Hadfield. (Doc. 1 ¶¶ 2−13.) Plaintiffs
3  allege the following facts.

4  Luke, who was 26 years old at the time of his death was diagnosed in high school
5  with bipolar disorder, schizophrenia, and attention deficit hyperactivity disorder (ADHD),
6  for which he was prescribed a strict regimen of six daily medications. (*Id.* ¶ 17.) The
7  medications enabled Luke to have a job and maintain relationships with his family and
8  girlfriend. (*Id.*) Luke was otherwise healthy with no physical ailments and was 6'2'' and
9  weighed 208 pounds. (*Id.*)

10  On the night of March 3, 2019, Luke was on a road trip, driving through Willcox on
11  his way back home to San Antonio. (*Id.* ¶ 18.) At around midnight, Willcox Police
12  Detective Valle pulled Luke over and arrested him on suspicion of driving under the
13  influence. (*Id.*) Sometime after Luke's arrest, unknown Defendants confiscated Luke's
14  prescription medications, a cursory inspection of which would have alerted any trained
15  officer that if Luke did not receive his medications in a timely fashion, his mental health
16  would deteriorate. (*Id.* ¶ 39.)

17  At about 1:50 a.m. on March 4, 2019, Luke arrived at the CCSO Willcox Detention
18  Facility and voluntarily submitted to a blood draw. (*Id.*) The test was negative for alcohol
19  but positive for amphetamines, which is consistent with Luke's Adderall prescription for
20  his ADHD. (*Id.*) This, and the following events that occurred at the Willcox Detention
21  Facility, were captured on the Detention Facility's video. (*Id.*)

22  For the next five and one-half hours, Luke was alone in a wall-to-wall cement cell,
23  engaging in routine activities, such as napping, eating, and conversing with officers on
24  duty, and he requested a phone to contact a lawyer. (*Id.* ¶ 20.) The cell had a solid metal
25  door with a horizontal slot in it, through which items could be passed, including a phone
26  Luke was given to set up a phone account. (*Id.*) During his initial detention, and for the
27  next six hours, Luke complied with all directives in a courteous and calm manner, and only
28

after Luke was deprived of his prescribed medications for six hours did Luke's behavior turn erratic.  (*Id.* ¶ 39.)

As of 7:30 a.m. on March 4, 2019, Luke had not received any of his medications, and he appeared restless.  (*Id.* ¶ 21.)  Minutes later, he charged the cell door, aiming his right shoulder below the metal slot, and when his shoulder made contact with the door, he lost his footing and cut his head on the lip of the metal slot as he fell to the floor.  (*Id.*)

At 7:51 a.m., Defendants Cochise County Deputy Robinson and Detention Sgt. Pralgo opened Luke's cell door.  (*Id.* ¶ 22.)  At that time, Defendant Cochise County Fire Medic Jordan Faulkner was in the booking area preparing to examine Luke's head wound.  (*Id.*)  Luke emerged calmly from his cell but then sprinted in a fight-or-flight panic through the booking area between the male and female cells and into the female common area, with Defendants Robinson, Pralgo, and Detention Officer Bohlender trying unsuccessfully to tackle him.  (*Id.* ¶ 23.)

Luke reached a dead end in the female cell area and stood with his back against the wall with Defendants Robinson, Pralgo, and Bohlender facing him.  (*Id.*)  Defendant Pralgo deployed his taser at Luke; eight seconds later, Defendant Robinson deployed his taser at Luke; and fifteen seconds later, Defendant Robinson also deployed his taser at Luke.  (*Id.* ¶ 24.)  A scuffle ensued in the doorway to the booking area, during which Defendants Robinson, Pralgo, and Bohlender heaped onto Luke and attempted to handcuff his left hand to the door handle.  (*Id.* ¶ 25.)  Defendants Cochise County Lt. Gijanto and Sgt. Noland also arrived and entered the fray at 7:54 and 7:55, respectively.  (*Id.*)

Defendants Robinson and Noland were at Luke's legs as Luke lay on the ground, and three additional officers were at Luke's head and torso.  (*Id.* ¶ 26.)  Robinson delivered eleven consecutive closed fist blows to Luke's legs while leg irons were fastened onto Luke, and Defendant Pralgo deployed his taser twice to Luke's thigh for approximately five seconds each time.  (*Id.*)

At 8:02 a.m., Luke was dragged to his feet, and he collapsed to his knees.  (*Id.* ¶ 27.)  At that time, no less than six officers, including Defendants Valle and Willcox Police

Officer Callahan-English, wrenched Luke's body and handcuffed his hands behind his back. (*Id.*) At 8:03 a.m., Defendant Pralgo retrieved a restraint chair, and four officers hoisted Luke onto the chair with his hands cuffed behind his back. (*Id.*)

At 8:05 a.m., Defendant Pralgo deployed his taser on Luke's thigh one more time for approximately five seconds while Defendant Callahan-English forced Luke's head into a restraint hold and four other officers fastened Luke's body into the restraint chair. (*Id.* ¶ 28.) By 8:06 a.m., Luke was fully restrained, seated in the booking area. (*Id.*) At 8:15 a.m., Pralgo tightened Luke's shoulder straps and fastened a lap belt onto Luke. (*Id.* ¶ 30.)

At 8:24 a.m., Luke rolled his head back against the headrest, gasping for air. (*Id.* ¶ 31.) At the same time, four officers walked directly by Luke, passing from the male cell area through the booking area and into the female cell area. (*Id.*) Luke then sat alone, gasping for air until 8:27 a.m., when he took his final breath. (*Id.* ¶ 32.) After this, Defendant Callahan-English walked directly past Luke's breathless body. (*Id.* ¶ 33.)

Moments later, at 8:28 a.m., Defendants Pralgo, Valle, and Faulkner found that Luke did not have a pulse. (*Id.* ¶ 33.) Pralgo then pushed the restraint chair forward, revealing a puddle of Luke's urine. (*Id.*)

At 8:29 a.m., Luke was removed from the restraint chair and placed onto the floor, still handcuffed. (*Id.* ¶ 34.) For the next ten minutes, officers took turns administering chest compressions and shocks with an Automatic External Defibrillator. (*Id.*) At about 8:34 a.m., Luke was transported to the Northern Cochise Community Hospital (NCCH), and his pulse was regained, but he remained unresponsive. (*Id.*)

When medical staff at NCCH determined that Luke needed advanced treatment, Luke was transported via helicopter to the Tucson Medical Center (TMC), where he was placed on life support. (*Id.* ¶ 35.) At TMC, Luke was diagnosed with anoxic brain injury, which occurs when the brain is deprived of oxygen. (*Id.*) He was also diagnosed with a C6 vertebral fracture, rhabdomyolysis, lactic acidosis, and transaminitis. (*Id.*)

On March 9, 2019, at Plaintiffs' instruction, Luke was removed from life support. (*Id.* ¶ 36.) Luke did not immediately pass away but was transported to hospice in

respiratory distress. (*Id.*) Plaintiffs sat at Luke's bedside while Luke continued to struggle and, wishing Luke to be at peace, requested aggressive palliative care. (*Id.*)

On March 10, 2019, at 6:26 p.m., Luke passed away. (*Id.* ¶ 37.) The autopsy report listed the causes of death as blunt force injuries, rhabdomyolysis, cardiomegaly, and coronary artery atherosclerosis. (*Id.* ¶ 38.)

Plaintiffs assert four § 1983 claims: (1) an excessive-use-of-force claim against Defendant Peace Officers, Cochise County, and Willcox; (2) a failure-to-train claim against Cochise County and Willcox; (3) a "supervisory liability" claim against Defendants Cochise County Sheriff Dannels and Willcox Director of Public Safety Hadfield; and (4) substantive due process and equal protection claims against all Defendants. (*Id.* ¶¶ 42−57.) Plaintiffs also assert against all Defendants a state law wrongful death claim, over which this Court has supplemental jurisdiction. (*Id.* ¶¶ 58−62.) Plaintiffs seek ten million dollars in damages, as well as attorneys' fees, actual and exemplary damages, pre- and post-judgment interest, and costs. (*Id.* ¶¶ 63−65.)

## II.     Federal Rule of Civil Procedure 12(b)(6)

Dismissal of a complaint, or any claim within it, for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) may be based on either a "'lack of a cognizable legal theory' or 'the absence of sufficient facts alleged under a cognizable legal theory.'" *Johnson v. Riverside Healthcare Sys., LP*, 534 F.3d 1116, 1121–22 (9th Cir. 2008) (quoting *Balistreri v. Pacifica Police Dep't,* 901 F.2d 696, 699 (9th Cir. 1990)).  In determining whether a complaint states a claim under this standard, the allegations in the complaint are taken as true and the pleadings are construed in the light most favorable to the nonmovant. *Outdoor Media Group, Inc. v. City of Beaumont*, 506 F.3d 895, 900 (9th Cir. 2007).  A pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  But "[s]pecific facts are not necessary; the statement need only give the defendant fair notice of what . . . the claim is and the grounds upon which it rests."  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (internal quotation omitted).  To survive a motion to dismiss, a complaint must state a claim that is "plausible

on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *see Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

As a general rule, when deciding a Rule 12(b)(6) motion, the court looks only to the face of the complaint and documents attached thereto. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002); *Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc.*, 896 F.2d 1542, 1555 n.19 (9th Cir. 1990). If a court considers evidence outside the pleading, it must convert the Rule 12(b)(6) motion into a Rule 56 motion for summary judgment. *United States v. Ritchie*, 342 F.3d 903, 907–08 (9th Cir. 2003). A court may, however, consider documents incorporated by reference in the complaint or matters of judicial notice without converting the motion to dismiss into a motion for summary judgment. *Id.*

**III.   Discussion**

Defendants assert three arguments for dismissal: (1) the individual Defendants are entitled to qualified immunity as to Plaintiffs' constitutional claims; (2) Plaintiffs fail to plead plausible *Monell* claims against Cochise County and Willcox; and (3) Plaintiffs fail to plead a state law wrongful death claim. (Doc. 9 at 7−17.)

**A.   Qualified Immunity**

Government officials enjoy qualified immunity from civil damages unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). In deciding if qualified immunity applies, the Court must determine: (1) whether the facts alleged show the defendant's conduct violated a constitutional right; and (2) whether that right was clearly established at the time of the violation. *Pearson v. Callahan*, 555 U.S. 223, 230-32, 235-36 (2009) (courts may address either prong first depending on the circumstances in the particular case).

Whether a right was clearly established must be determined "in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The plaintiff has the burden to show that the right was clearly established at the time of the alleged violation. *Sorrels v. McKee*, 290 F.3d 965, 969 (9th Cir. 2002); *Romero v. Kitsap County*, 931 F.2d 624, 627 (9th Cir. 1991). "The contours of the right must be sufficiently clear that at the time the allegedly unlawful act is taken, a reasonable official would understand that what he is doing violates that right." *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (internal quotations omitted). In other words, "in the light of pre-existing law the unlawfulness must be apparent." *Id.* Therefore, regardless of whether the constitutional violation occurred, the officer should prevail if the right asserted by the plaintiff was not "clearly established" or the officer could have reasonably believed that his particular conduct was lawful. *Romero*, 931 F.2d at 627.

### 1. Excessive-Use-of-Force

A pretrial detainee has a right under the Due Process Clause of the Fourteenth Amendment to be free from punishment prior to an adjudication of guilt. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). A pretrial detainee may therefore allege a cause of action under the Due Process Clause where conditions of confinement, such as food, clothing, shelter, medical care, and personal safety, "amount to punishment." *Bell*, 441 U.S. at 535; *see DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 200 (1989). Conditions amount to punishment when: (1) the conditions result in a sufficiently serious denial of the minimum standard of care, and (2) the official's actions or omissions with respect to the conditions are objectively unreasonable, such that it can be inferred that those conditions are imposed for the purpose of punishment. *Kingsley v. Hendrickson*, 576 U.S. 389, 396−97 (2015); *Bell*, 441 U.S. at 538; *DO Castro v. Cnty. of Los Angeles*, 833 F.3d 1060, 1070−71 (9th Cir. 2016).

Whether an officer's actions were objectively unreasonable is determined "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 396−97. Whether the

conditions and conduct rise to the level of a constitutional violation is an objective assessment that turns on the "facts and circumstances of each particular case." *Id*. (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). In determining whether a use of force was reasonable, a court should consider factors including, but not limited to, "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397.

In their Motion to Dismiss, Defendants reiterate key allegations concerning individual officers' attempts to subdue and control Luke after he had injured himself in his cell and then tried to flee, and they assert in conclusory fashion that "the actions of each individual met constitutional standards for use of force under the circumstances, and did not violate Plaintiff's rights to substantive due process or [Luke's] equal protection rights. (Doc. 9 at 15−18.)

Defendants' argument that all the actions of all of the defendant officers "met constitutional standards" is insufficient to show the complaint fails to state claims of a Constitutional violations by a particular officer, or that, if a violation occurred, the particular officer did not violate any rights of which a reasonable officer would have known. As to whether a constitutional violation occurred, Defendants assert summarily that certain alleged actions of each officer were justified during the overall encounter with Luke "because Hyde was a self-harming, fleeing and fighting jail detainee who was a threat to detention staff, law enforcement, and others in the jail . . . ." (*See* Doc. 9 at 14−15.) Defendants fail to discuss the actions of each Defendant for whom they seek dismissal or to apply the *Kingsley* factors to analyze whether that specific officer's use of force was reasonable in response to the specific threat posed by Luke at the relevant time in the encounter and fail to discuss specific actions in relation to clearly established law. Lacking

substantive arguments as to why each Defendant officer is entitled to qualified immunity, the Court cannot find that the officers are entitled to qualified immunity.[1]

### 2.   Other Constitutional Claims

Defendants argue that Defendant Officers, Sheriff Dannels, and Public Safety Director Hadfield are entitled to qualified immunity as to Plaintiffs' substantive due process, equal protection, and failure to train or supervise claims. (*Id.* at 15.) In one section of their motion Defendants set forth the legal standards for each of these claims. In their argument, however, Defendants argue only that "Plaintiffs' Complaint does not state a plausible claim for relief against the individual Defendants on these constitutional claims, nor does the alleged conduct violate any clearly established law." (*Id.*) Because the motion fails to identify specific deficiencies in the Complaint as to each of these claims, or to assert substantive arguments in support, the Court will deny Defendants' Motion to Dismiss Plaintiffs' remaining constitutional claims.

### B.   Failure-to-Train Claims Against Cochise County and Willcox

A municipality or other local government unit, such as a county, may not be sued under § 1983 solely because an injury was inflicted by one of its employees or agents. *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006). Rather, the municipality is liable only when the execution of its policy or custom inflicts the constitutional injury. *Id.*; *see also Miranda v. City of Cornelius*, 429 F.3d 858, 868 (9th Cir. 2005); *Leatherman v. Tarrant Cnty. Narcotics Intelligence and Coordination Unit*, 507 U.S. 163, 166 (1993); *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978) ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983").

---

[1] The Defendants do, in their reply, provide more particular details as to each defendant's actions. However, these arguments are not included in the motion, and Plaintiffs did not have an opportunity to respond to these arguments. Accordingly, the Court will not consider the newly-asserted arguments.

"[T]he inadequacy of police training may serve as the basis for § 1983 municipal liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Flores v. Cty. of Los Angeles*, 758 F.3d 1154, 1158 (9th Cir. 2014) (citing *City of Canton v. Harris,* 489 U.S. 378, 388 (1989)). "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). To sufficiently plead a *Monell* claim and withstand a Rule 12(b)(6) motion to dismiss, the allegations in a complaint "may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *AE ex rel. Hernandez v. Cnty. of Tulare*, 666 F.3d 631, 637 (9th Cir. 2012) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)). A plaintiff must allege facts to show that the defendant "disregarded the known or obvious consequence that a particular omission in their training program would cause [municipal] employees to violate citizens' constitutional rights." *Flores v. Cnty. of L.A.*, 758 F.3d 1154, 1159 (9th Cir. 2014) (emphasis added) (internal quotation marks and citation omitted). "Absent allegations of specific shortcomings in the training . . . or facts that might place the City on notice that constitutional deprivations were likely to occur," a plaintiff fails to adequately plead a § 1983 claim for failure to train. *Bini v. City of Vancouver*, 218 F. Supp. 3d 1196, 1203 (W.D. Wash. 2016). Additionally, "random acts or isolated events [are] insufficient to establish custom." *Navarro v. Block*, 72 F.3d 712, 714 (9th Cir. 1995). "Liability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), *holding modified by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001). Accordingly, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (internal quotation marks and citation omitted).

Defendants argue that Plaintiffs' claims against Cochise County and Willcox should be dismissed because Plaintiffs merely allege, in conclusory fashion, that these entities failed to train their law enforcement officers, and these failures to train caused a constitutional injury. (Doc. 9 at 16.) They argue that "[t]hese vague allegations are insufficient to support a § 1983 claim that the municipality has failed to train its officers on the use of force or on other aspects of law enforcement." (*Id.*)

Plaintiffs argue in their Response that they have alleged sufficient facts to show that the officers of these entities were not properly trained on how to treat detainees with mental health issues, specifically individuals who, like Luke, need prescribed medications. (Doc. 10 at 13.) They also argue that the facts alleged show that the officers had not received proper crisis intervention training (CIT), which includes a basic understanding of mental health issues, appropriate de-escalation techniques, and proper communication tactics. (*Id.* at 14.)[2]

The facts alleged regarding Defendant Officers' confiscation of and/or failure to provide Luke his required medications; their failures to recognize that his medications were commonly prescribed for mental health issues and, if withheld for a prolonged period, could lead to sudden, erratic behavior; and, most seriously, the collective failures to check on Luke's mental and physical condition for more than 20 minutes after he was taken down by force and confined to a restraint chair or to respond to his difficulties breathing for more than 3 minutes until he stopped breathing, are enough to support a plausible inference that neither Cochise County nor Willcox properly trained their officers on how to assess and treat arrestees and detainees with medical and mental health needs requiring medication or to monitor and respond to urgent life-threatening needs such as the inability to breathe. Because it is "known or obvious" that the risks to detained individuals of not having access

---

[2] Plaintiffs also argue that the allegations in the Complaint are sufficient to show that these entities failed to train their employees regarding the reasonable use of force. (Doc. 10 at 15.) This argument, however, goes beyond the substance of Plaintiffs' failure-to-train claim in the Complaint, which alleges a failure to train specifically with respect to dealing with detainees with mental health issues. (*See* Doc. 1 ¶¶ 52−53.)

to their required medications, or of not being properly monitored after extreme physical altercations, can lead to constitutional violations, Cochise County's and Willcox's alleged omission of proper training of the officers responsible for Luke's arrest and detention supports plausible failure-to-train claims against these Defendants. *See Flores*, 758 F.3d at 1159. Accordingly, the Court will not dismiss these claims.

### C. State Law Wrongful Death Claims

Arizona's wrongful death statute states that "[w]hen death of a person is caused by wrongful act, neglect or default, and the act . . . is such as would, if death had not ensued, have entitled the party injured to maintain an action to recover damages in respect thereof," the person responsible for the alleged negligence or default "shall be liable to an action for damages." Ariz. Rev. Stat. § 12-611.

Plaintiffs allege in their Complaint that Defendants committed three underlying torts that are actionable under this statute: reckless battery, grossly negligent supervision and provision of medical care, and negligent training and supervision, which is an independent tort that applies solely to Cochise County and Willcox as employers. (Doc. 1 ¶¶ 58, 60−61.)

Defendants argue that Plaintiffs' state law wrongful death claims must be dismissed because the use of force to subdue and control a fighting or fleeing jail detainee is justified under Arizona law and cannot support a civil liability claim. (Doc. 9 at 17.)

Defendants rely on A.R.S. § 13-402 which states that "conduct which would otherwise constitute an offense is justifiable when it is required or authorized by law." A.R.S. § 13-402. Conduct is justified when "[a] reasonable person would believe such conduct is required or authorized by the judgment or direction of a competent court . . . ;" A.R.S § 13-402(B)(1), or when "[a] reasonable person would believe such conduct is required or authorized to assist a peace officer in the performance of such officer's duties, notwithstanding that the officer exceeded the officer's legal authority." A.R.S § 13-402(B)(2). Defendants also rely, without discussion, on A.R.S. § 13-403(2), which authorizes jail officials to use force "for the preservation of peace, to maintain order or

discipline, or to prevent the commission of any felony or misdemeanor"; A.R.S. § 13-404(A), which states that "a person is justified in threatening or using physical force against another when and to the extent a reasonable person would believe that physical force is immediately necessary to protect himself against the other's use or attempted use of unlawful physical force"; and A.R.S. §§ 13-409 − 413, which, like § 13-402(B), predicate the justifications of physical force, including deadly force, on what "a reasonable person" or "a reasonable person effecting the arrest or preventing the escape [of another]" would believe. (Doc. 9 at 17.) Specifically, section 13-413 states that "[n]o person in this state shall be subject to civil liability for engaging in conduct otherwise justified pursuant to the provisions of this chapter." A.R.S. § 13-413.

Defendants' statutory arguments are not a reason to dismiss Plaintiff's wrongful death claims at this stage because, under the above statutes, whether the use of force was justified rests on what a reasonable person or a reasonable officer would believe – an issue that rests with the facts, which are yet undetermined. Drawing all factual inferences in favor of Plaintiffs, Plaintiffs have stated a plausible claim that Defendant Officers' uses of force to control and contain Luke were excessive and not reasonably justified.

Defendants also argue that Plaintiffs' wrongful death claims must be dismissed pursuant to *Ryan v. Napier*, 425 P.3d 230, 233 (Ariz. 2018), on the ground that "Arizona no longer recognizes a negligent use of force in law enforcement, whether couched as simple or gross negligence." (Doc. 9 at 17.)

In *Ryan*, the Arizona Supreme Court held that a plaintiff bringing an excessive force claim "cannot assert a negligence claim based solely on an officer's intentional use of physical force. The appropriate state-law claim is for battery[.]" *See also Liberti v. City of Scottsdale*, 816 F. App'x 89, 91 (9th Cir. 2020) ("In Arizona, plaintiffs cannot base a negligence claim on an intentional use of force nor on a law enforcement officer's negligent evaluation of whether to intentionally use force. . . . Any negligence claim must be based on conduct independent of the intentional use of force.") (inner quotations omitted).

Plaintiffs do not dispute that, under *Ryan*, a negligence claim cannot be based on the defendants' intentional conduct, but must, instead, be based on negligence, independent of the intentional use of force. (Doc. 10 at 16.) But Plaintiffs argue that, while *Ryan* held that negligent and intentional conduct were mutually exclusive grounds for liability, it also stated that plaintiffs may plead both negligence and intentional conduct as alternative theories of liability. (Doc. 10 at 16.) *See Ryan*, 425 P.3d at 238 ("plaintiffs may plead a negligence claim for conduct that is independent of the intentional use of force or plead negligence and battery as alternate theories if the evidence supports each theory.") Plaintiffs argue that that is precisely what they have done here. (Doc. 10 at 16.)

Here, the possible claims underlying Plaintiff's wrongful death claims—reckless battery, negligent supervision and provision of medical care, and failure to train—implicate possible negligence that could support such a claim. Defendants specifically argue only that "excessive use of force" is not a negligence claim because, "[h]ere, the force was intentionally administered." (Doc. 9 at 17.) Their argument therefore rests on the intent of the officers engaged in the uses of force, which—like the question of whether the officers' actions were reasonable—is a factual issue. Additionally, even if each of the officers' alleged uses of force were intentional, *Ryan* does not, as Plaintiffs' point out, prohibit Plaintiff from presenting both intentional and negligent conduct as alternate theories of liability.

Finally, Defendants fail to address the negligent supervision, failure to provide proper medical care, and failure to train aspects of Defendants' alleged negligent conduct underlying Plaintiffs' wrongful death claim. On the whole, Plaintiffs' allegations regarding Defendants' actions leading up to Luke's eventual confinement in a restraint chair, where he was unable to breathe and passed, are sufficient to support potential negligence claims and are therefore sufficient to support Plaintiffs' wrongful death claims. The Court will deny Defendants' motion to dismiss these claims.

//

//

- 14 -

**IT IS ORDERED:**

(1) Defendants' Motion to Dismiss (Doc. 9) is **denied**.

(2) Within **10 days** from the date of this Order, Defendants must file an answer to the Complaint.

Dated this 15th day of January, 2021.

_____
Honorable Jennifer G. Zipps
United States District Judge